Mr. Foreman, you're in. Good morning. Good morning, your honors. Jeffrey Foreman on behalf of the appellant Michael Marinucci. May it please the court, one of the most fundamental aspects of any case in which fraud is alleged is the element of reliance. That is that a mere breach of contract claim in a bankruptcy proceeding has to have more than just the breach of contract in order to be viable as an allegation of a fraud which would then be non-dischargeable. Because in order to have a fraud, you not only have to show that there was a knowingly false representation, which you had a right to rely on, but you then have to show that you did rely on it. And you have to show that that reliance went to your detriment. Your honors, this case has none of the elements of fraud. But the most egregious one, it's the undeniable showing that SG Homes did not rely on any of the representations which Chesapeake Contracting or Mr. Marinucci made about bonding. Because that, your honor, I would first of all remind you that the allegation of fraud in this bonding didn't even surface until after the motion for judgment on the pleadings because the only allegation for the adversary proceeding for non-dischargeability was a violation of the Maryland Construction Trust Fund statute which the law is clear does not give you a non-dischargeable right. So after, and understand, there was a suit filed in Montgomery County. There was this, then there was this adversary proceeding. Nothing about fraud other than violation of the Construction Trust Fund statute. We filed a motion for judgment on the pleadings and then all of a sudden it gets amended and said, oh, well, wait a minute, we were defrauded. But this bare allegation that we were defrauded by statements about bonding is accompanied by instance after instance where S.G. Holmes showed that it did not rely, specifically did not rely on the bonding. Number one, it sends a letter saying we've awarded you the job. Before you can start, you have to have a performance bond, not a payment bond, by the way, a performance bond. You have to have it. Then they say, well, we asked them to start without it. So obviously bonding was not that critical. Then it permits the job to go on for months without the bond. Then five months after the job is started, they finally come and give Chesapeake a contract, which they draft. And what does it say? Bonds are excluded. It then goes another four or five months and they get to the point where they want to terminate the contract. Again, bonds are not in place. They want to terminate the job. They say, well, look, you haven't been paying your subs and we're getting complaints and therefore we're terminating you. Nothing about the bonds. Now, I have to tell you, Your Honor, it can show no. There is not a single instance where S.G. Holmes can say in this record that they relied on the fact that there would be bonding. S.G. Holmes is going to say, well, but Mr. Randall testified that if I knew they weren't going to give me a bond, I wouldn't have given them the job. So let's understand what that says. If I knew that they weren't going to give me a bond, I wouldn't have given them a contract that said you don't have to give me a bond because that's what they did. They gave them a contract that said bonds are excluded. They let them work the entire job with no bond. Now, just as importantly is the issue of when you want to convert this breach of contract claim into a fraud claim, when was this fraud? Because, as Your Honors know, this job started in January of that year. It went on. The court found that Mr. Maranucci originally did intend to get a bond and he made applications for a bond. And it wasn't until late March where the bonding company told Mr. Maranucci that both he and his wife would have to sign personally for these, and his wife said no. So at that point, Mr. Maranucci, that's when Judge Keir found that Mr. Maranucci no longer intended to get a bond, and then that's when all these false statements were made. Okay, let's assume they're false statements made. The fact of the matter is that the law is that false representations, fraudulent representations, after the contract is made will not support a discharge for fraud. Roundtree, which is from this court, and Judge Gregory, it's your case, Roundtree says the fraud had to induce you to get something. Well, Chesapeake already had the contract. They were already working. They were working for months. And then, as I said, once the frauds were made, I mean they gave them a contract that said no bonds are necessary. So the question of waiver and the question of reliance, there is not a single instance in this record that shows reliance on the bond. So then the other instance of alleged fraud are these certifications. Now, S.G. Holmes drafts a certification that must be signed. It's on every page of every requisition, and it says that you're going to use the funds for labor, material, and other expenses. Everybody who testified said that's precisely what we did. S.G. Holmes says, yeah, but that's not really what we want. We meant and we intended, and Judge Keir said, well, you know, this is what they intended. They intended it to mean that you were only going to spend the money on the Crabs Branch job. You would have to prevail on both the bond issue and the certification issue in order to win. No, because I'm going to get to damages in a second. Well, assuming that the damages calculation was valuable, if either prong is successful for the creditor, then you would lose. Well, I don't think so, Your Honor, because the certification issue didn't generate a contract. It in no way generated the contract. The contract was already formed. And so if the contract is already formed and the contract is ongoing, again, even false certifications, even false statements, will not be held to be fraudulent for purposes of a non-dischargeability determination. So, you know, I would submit to you that the real issue, though, with those certifications is that the court is not entitled to add language only for this job. It was S.G. Holmes' blank piece of paper. It was S.G. Holmes' blank pen. They could have insisted that Chesapeake sign whatever they wanted them to. Mr. Maranucci testified and Mr. Schwartz testified that the money was spent exactly as the certification said, precisely. Nobody said they weren't. S.G. Holmes didn't put on any evidence to show that it wasn't. S.G. Holmes said, well, you didn't spend it on our job. Okay, that's not what the certification says. But let me get to damages real quickly because I want to get to that before I reserve some time. Your Honor, there is not a scintilla of evidence that S.G. Holmes suffered any damages whatsoever. Now, what they've said is we paid your subcontractors $208,000 for work that we had already paid you for, and you didn't take that money and you didn't pay the subs. Okay, that's the breach of the construction trust fund statute, but even there you have to show damages. The letter terminating Chesapeake specifically said, listen, you haven't been paying your subs. Now, here's what's going to happen. We're terminating you, and we have already done the math. We have already done the calculations, and we're going to pay these specific contractors of yours, and when we're finished, we don't owe you any more money. That is precisely what it says. It says, in addition to Hanson, Precast, Ferguson, Horizon, Concrete, and Contact, and I'm reading from appendix page 179, it is our intent to pay these subcontractors and suppliers and possibly others directly with funds due to Chesapeake site contracting. And then it says, based on our preliminary calculations, once all the subcontractors and suppliers are paid, no money will be due to Chesapeake site contracting for work performed. So I gave an example in our brief, which I think is right on the money. If you bill me $100 because you say, Judge Agee did some work, and you're the general contractor, and I pay you the $100, and you don't pay Judge Agee, and then Judge Agee comes to me and says, well, I hadn't been paid by Judge Gregory. If I have to pay him that second $100, we've got $100 of work, and I've paid $200. But if Judge Gregory, if you bill me the $100, you don't pay Judge Agee, and then you bill me a second $100. And I say, listen, Judge Agee has said to me you didn't pay him, so I'm going to take that second $100 I owe you, and I'm paying him. Now, you've got $200 worth of work. I've paid $200. I didn't pay Judge Agee twice. I paid you. You were supposed to pay him. You didn't. So I did using your money. That's precisely what they said they were going to do. Now, here's the deal. In their exhibits, it says, and I would refer your honors to Appendix 232 and 233 and 234, where the exhibit says, listen, we've billed $1,407,000 plus $67,000 of retainage. We've only been paid $1,145,000. That's their exhibit. They didn't deny that. So by that calculation, there's $320,000 that S.G. Holmes is holding of Chesapeake's money. They say we paid your subs $208,000. There's still $120,000 unaccounted for. And the fact of the matter is, even if there was fraud, Your Honor, even if the bonding is fraudulent, even if the certifications are fraudulent, the fact of the matter is one of the elements of fraud is that you had to incur damages. There is not a scintilla of evidence. Here's the questions, Your Honor. Well, when they said we're going to use your money to pay your subs, well, how much did they pay? You're not going to find that. Well, how much did they owe? You're not going to find that other than in this exhibit 52, which says essentially you owe me $320,000. What did they do with the money that they said we're going to pay with your funds? What did they do with that money? Well, how much were they supposed to spend on this entire project for Chesapeake, and how much did they spend? Because let's say they cut deals with people and they ended up spending less than their contract price. They haven't proven damages, not one penny's worth of damage. And I submit to the court, Your Honor, that not having proven a penny's worth of damage says you haven't proven your fraud case, you haven't proven reliance, and you haven't proven damages. And with that, Your Honor, if you don't have any questions, I'll reserve the balance of my time. All right. Thank you, Mr. Follin. Mr. Gould? May it please the Court, my name is Steve Gould. I represent the plaintiff and appellate in this case. This is a garden variety fraud case. Judge Wilkinson, counsel, discussed the Roundtree case. He mentioned that in one of his first remarks. Roundtree was not your typical fraud case. And Judge Wilkinson, in his concurring opinion, said the following. The more common occurrence will reflect the fact that frauds and misrepresentations... He wasn't writing for the court.  He wasn't writing for the court. I'm sorry? He wasn't writing for the court. Correct. Okay. Correct. He was... Don't make that clear. Correct. It was a concurring opinion. Right. Roundtree was a case where there really was no damage. The fraud induced this friendship and she undertook some activities and no money changed hands as a result. This is a different case. And Judge Wilkinson said that that's really an exception. Most of the cases, most of the fraud cases, really fall within the purview of what this bankruptcy code is intended to apply to. And that's what we have in this case. We have a situation where Mr. Mirannucci finds himself in the midst of a recession. He's 50% of a company. His doubtful receivables went up. He can't get financing for new jobs. All of this is in the record. He's personally on the hook for debts of $6 million for the company. His monthly exposure is $200,000 a month that they have to pay to finance this debt. He draws a $150,000 salary. He testified that the operations of his company were dependent upon getting new jobs because financing... He couldn't get financing. Banks were putting the reins on it. So what did he do? He lied. He lied to my client. He lied in order to get money. That's what he did. Now, let's... I'm going to cite to you... There's... The record is replete with evidence of... And the court, the lower court, found very clearly a series of misrepresentations based in emails. We're getting the bond. He had already decided he's not getting the bond. He was lying. He was lying about his intent to get a bond. There's a difference, a fundamental difference between... Where was the contract for the bond that would induce the reliance? Because I think the parties agreed and the court agreed, the bankruptcy court agreed, that you couldn't tell from the contract whether a bond was required or not. And if so, what kind of bond was required? Okay. The bankruptcy court made... Judge Keir made very clear findings on that. The formal contract was not ratified until May. And what Judge Keir found, and it was based upon record evidence, was that the agreement between the parties then, prior to that time, has to be gleaned from the parties' communications. We have an email from Mr. Marinucci in February, right when he's starting work, saying, we're getting the payment, the PMP bond, just as we agreed, in March, in email. The bond should be here in a week. Then we get to May. And they're clearly... Look, my client admitted it in his examination. Clearly there is ambiguity in the formal contract as to whether a bond was required. Ambiguity? Is it required or not in the contract? We say it is. Is it written in there that a bond is required in the nature of the bond? It's not there, is it? There... We said it was. Now, but I think the critical point, and let's... For sake of argument, let me concede it, because I'd like to explain to the court why it's irrelevant. Because as soon as the contract was ratified, you go to May 14, 2008, and this is at page 170 of the extract. This is right after it's ratified. My client is saying, where's the bond? Mr. Moneykaisen, who is working under Mr. Marinucci, says, oh, there must be miscommunication. It's not in the contract.  We need the contract. We need the bond. You're wrong about that. Now, the contract absolutely gives my client the right to demand a bond at its expense. So whether the formal contract requires it in the first instance or not is irrelevant, because what is critical is it allows my client to demand it at its expense, and it's precisely what my client did. And in response, and this is absolutely critical at page... But you're already in contract now, and you're saying, right, you have an option unilaterally to demand one. Correct. But you're already in contract with them. Okay, but... And you had the option also to stop all dealers until I get it, correct? That's true. And you did. That's true. But then how can you say you induced when you're already in contract, or you relied upon it when you knew? Did you pay for the bond? My client offered to pay for the bond. But you knew that you didn't have a bond because you never paid for one. There's no question that my client knew that there was no bond. That's not the basis of the fraud claim. The fraud claim is not based upon a failure to get a bond. The fraud claim is predicated on an intentional misrepresentation that they were trying to get a bond and that they would get a bond. Had my client known... That's a breach of contract. No, that's a fraud. How's that fraud? For example, the person says, I'm going to paint your house on Friday. Well, they know very well they got plenty of work to do and they can't get to it for three months. So they don't get to it for three months. That's a fraud case simply because they didn't get to it and say, well, breach of contract. Under Maryland law, and the cases are, we cite them in our brief, there's an additional case that I didn't cite. It's Diamond Point Plaza v. Wells Fargo. Under Maryland law, a promise... It's not in your brief? It's not in my brief. Did you file a 28-day? I did not, Your Honor. Well, you know our rules, don't you? I do. I'm just... We'll do that later, but did you tell counsel this morning about the case? No, Your Honor, but... Okay, all right, go ahead. What I'm telling the court is that follows on longstanding principle based upon cases I did cite. And it's the case Tufts v. Poore. A representation in a contract that is intentionally false is fraud. That's the key, isn't it? If you promised to paint Judge Gregory's house on Friday and didn't get to it, but you intended to paint it on Friday when you told him you were going to paint it on Friday, that's a breach of contract if you don't do it. If you told him you were going to paint it on Friday and you knew good and well you weren't going to paint it on Friday and you told him that to get him to pay you some money up front, then that's a fraud. That's a fraud, and I'm going to make it worse. In this case, it's worse. If there's inducement. If I tell you, Your Honor, I'm going to paint your house on Friday, and in return you give me $100, and I have no intent not to paint it on Friday, not to ever paint it. Yes, we have a contract, and yes, I defrauded you. Okay, what evidence is there that there was no intention to get a bond when the promise was made to get a bond? Very clear evidence, Your Honor. You have to have that to make it a fraud, don't you? Absolutely. Mr. Marannucci, I would ask the court to read in its entirety the direct example. When I called Mr. Marannucci as an adverse witness in my directive him, and Judge Keir cited it at length. He absolutely was making promises that I'm going to get a bond when he knew at that point in time he was not going to get a bond. What evidence is there that he knew at that point in time that he wasn't going to get a bond? Mr. Marannucci's testament. With the court's indulgence, I'll find the sites for you. Well, you're telling me that it's his own testimony and it's in the record. It's his own testimony. It's in the record. At that time, Your Honor, you already had a contract. We already had a contract, but we had a contract that allowed us to request a bond. And this is a really important point. If I may pause, because I see what your issue is. At page 170, this is right after the contract was entered, my client said, Jay, and this is to Mr. Marannucci's employee, I think there may have been a communication breakdown. We still need to have the bond issued. Please let me know the cost of the bond so that I can revise the contract schedule A. How long do you think it will take to get the bond? He writes back, Paul writes back, copies it to Mr. Marannucci and says, Paul, I talked to Mike, this is Marannucci, via telephone, and we will get on the bond right away. We apologize for the confusion and will advise you of the cost as soon as we know what it's going to be. Then he says, on another subject, do you know when we can expect payment for our next billing? Judge Keir found, based upon the evidence, and he cites it very specifically, deposition testimony and other testimony. At that time when he said we're getting on the bond right away, that was a lie. He was not getting on the bond right away. He had no intention to get on the bond. It doesn't matter. It does matter because the point is the inducement. It's like Judge Ferber said, hypothetically, you knew when you promised me you were never going to paint my house, and that induced you to have a contract. What you're saying is that we have a contract, and then you said, oh, as a matter of fact, we want to enforce our unilateral option to have a bond. We want a bond, but you're already in contract. Under Maryland law, a fraudulent intent and a promise to engage in a contractual obligation without the intent to perform it is fraud, and in this instance. You mean every aspect of a contract? What you're saying is you have a contract. The contract is to bill whatever you do, period. But then you're saying that everything you do along in that contract, for example, I have a right to have my tub painted red when they renovate my house. So we've been having a contract for a whole year. We go along, and you say, oh, you never intended to paint my tub red. That's fraud and inducement? No, the fraud comes in when you promise to paint it red, but your intention when you're making that promise is to paint it blue. That's fraud. That's just one of many things you're building. Your Honor, under Maryland law, the law is well settled. A contractual promise without the intent to perform it is fraud. There's another one I cited in my brief. What about the fact that he tried to get it and his wife said, no, I won't sign it? That's precisely part of the evidence that he knew what he was saying was false because because of that, because the bonding company was making him and his wife sign a personal guarantee, he decided he is not going to get a bond. You've got to read the cross-examination. He absolutely decided he's not getting a bond, and yet he is allowing his guy to go out and tell SGMs I'm in the process of getting a bond. My client may have assumed in the contract a risk that Mr. Marinucci, despite his best efforts, may not succeed in getting a bond. My client never assumed the risk that he was being lied to. That's the difference. And this lie caused the parting of money. If you look at extract 17, this is the perfect example. Yes, we're getting the bond. We're on it. We're on it. We're really not. Send me my money. And that money that was sent was supposed to be paying subcontractors when in reality Mr. Marinucci was financing other jobs. He was financing his salary. He was trying to keep his company afloat. What about Mr. Foreman's argument that there's no damage here? What's the evidence that your client was damaged? We had a stipulation, and the stipulation is very clear, that my client paid, and Mr. Foreman used an example, and I'm going to explain why his example is incorrect. His example was, Judge Gregory, that you and I had a contract. You bill me for $100 based upon work that Judge Agee did. Did I pronounce that right, by the way? That Judge Agee did. I send you the $100. You're obligated under Maryland law and under the contract to take that money and pay it to Judge Agee. That's what the law requires. That's what the contract requires. That's what my client did, paid it to you. You do not pay it to Judge Agee. Instead, you pay your salary. You pay to keep other jobs going. You do whatever you're supposed to do with it. Then Judge Faber, now I'm going to add to his hypothetical to actually make it on fours with what happened here. Judge Faber did $100 of work, and you come to me, and then I find out I get a lien notice from Judge Agee. Hey, where's my money? Property is liened. I get lien notices from other people. I get a lien notice from Judge Faber. Where's my money? And I say to you, Judge Gregory, you know what? I gave you $100. You're supposed to give it to Judge Agee. Judge Faber now is owed $100. Instead of you sending me a bill so I pay you and you pay Judge Faber, I'm going to pay Judge Faber. Now, I've still, the money that I'm using, I still need to pay Judge Agee. So I paid you $100 to discharge Judge Agee's lien. I've got to pay Judge Agee $100. That's $200. Now I've got to pay Judge Faber. That's $300. Under Mr. Foreman's analogy, I only paid $200. But in what really happened, I paid $300, and I was only supposed to pay $200 because I double-paid Judge Agee. And in your scenario, how much do you owe me, though? I don't owe you anything. Is that establishing the record? Absolutely. You've got no offset? There is no offset. They never proved an offset. Their documentation, Plaintiff's Exhibit 52, and with your indulgence. I thought you said, I'm going to pay what I owe you directly to them. OU is, he's using the word OU. The way it worked is as the GC in the ordinary course, I owe the GC money. My privity of contract is with the GC, and you're this hypothetical Judge Greggie, so I owe it to you. Loren Randall, when he wrote the email, said, the money I'm going to send to you, I'm going to send to the subs anyway. I'm withholding it because I have all these other claims out there. As a matter of fact, you have probably a retainer. Yeah, but even with the retainer, over 100. Under this record, what's the amount of your retainer you have? I don't know the exact amount of the retainer. How did you know your damage, then? Because my client paid twice for stuff that it only should have had to pay once. But if the retainer exceeds that, what's your damage? Because if you look at Plaintiff's Exhibit 52, even with the retainage, over half a million dollars of unpaid invoices were on this job, and my client testified unequivocally, unequivocally, both on cross and direct, that the money that was due, that $100 that was for that check that had been written to Chesapeake, the amount of money and liens out there far exceeded that. There was no offset. And by the way, offset is an affirmative defense. It's not our burden to disprove an offset. It's their burden to prove it. They tried to prove it, but Judge Shakir wasn't buying what they were saying. All they put up was, Mr. Maranucci testified, well, it was $277. There's no evidence of that. Counsel, here's how I understand your case on damages. So I want you to tell me if I've analyzed it correctly. By stipulation, you prove, you would say this, in essence, my prima facie case of damages. I proved that I made payments twice that I was only required to make once. That was your prima facie case. Your position is, at that point, it was incumbent upon the debtor to come back with evidence to burden of persuasion, then move to the debtor to prove offset or some other type of defense. And as I understand your case, their proof of offset was Mr. Maranucci's testimony, which the bankruptcy court did not credit. So at that point, there would be no offset defense. And there was no, in effect, it was a failure for them to carry their burden once you proved the prima facie case. Now, is that your case? That's certainly a part of it, but what that... Part of my leave-and-out. Yeah, well, there's another argument that Mr. Foreman makes, which is you have to look at the total contract price. If at the end of the day we wound up paying less, even with the double payments, than we expected to pay Chesapeake, somehow we're not damaged. And the fallacy in that argument is he's looking at that contract wrong. The contract, and the contract has very specific schedules. It actually itemizes out, and the payments and the payment applications, which are part of it, were submitted in the record. And you'll see there's specific line items of tasks that have to get done on this project, and there's a price assigned to each one. My client agreed... Let me interrupt you and stop you there. Sure. I would want the opposing counsel to answer the same question. Is there evidence in the record that once you put your, what I'm calling a prima facie case on, that the debtor adduced proof that money was owed to them? Yeah. Any money was owed on the contract to you? My recollection is... Other than Mr. Maranucci's testimony. There is no... The entire defense case was through Mr. Maranucci's testimony. No documentary evidence. And what... So... But there was proof, and Mr. Randall testified at length and showed how he got to the double payments. Not only was it stipulated, he actually walked the court through the records and how he arrived at that using one or two examples. But going back to this contract, this contract price was not an immutable price. The contract itself says you can change the scope of work. If my client, after discovering the fraud... And by the way, this is a very important point. My client discovered that Mr. Maranucci never had an intention to get a bond notwithstanding his promises at the November 9th deposition in 2009. It wasn't until after this case that my client found out that he was being lied to. What happens if we don't think that... Going back to the beginning of the argument, if we don't think the bond argument is viable? You still went on the bankruptcy course alternatively? Sure, because the certification itself was fraudulent. I see my time is up. Should I... We're good. Okay. The certification was fraudulent. The law is very clear that if you are under the circumstances of this case and under the circumstances of this industry, and I laid it out very clearly when I did my direct examination of Mr. Maranucci, that in this industry, when contractors expect, when they get the money, they have to turn around and pay their subs with it. The certification, the representation, that's what it meant. That's what Mr. Maranucci knew it meant, and he testified he knew that the contractual provision required it, Maryland law required it, that when you receive your money, you receive it, and you have to turn around and pay. The certification, their argument is like, well, Walsh v. Edwards is a case, and I'm going to have to file that supplemental paper to make your owner aware of these cases. Walsh v. Edwards is a case where a person, a seller of a home said, no, the creek in the back is not causing flooding in the rear of my home, but it was causing flooding on the side of the home. That was fraud, and that's exactly what we have here. So even if you disregard the bond argument, the certification argument still stands. So when a general contractor doesn't pay his subs, that's all those cases of fraud cases? No, Your Honor. When a general contractor lies to pry money out of the owner. No, no, you said if they certify that they've paid and they don't pay it, that's fraud. But if he's lying. But that's the lie, they didn't pay him. Yeah, a lie is fraud. So all those cases of fraud cases where if you file a false certification, you're lying in the certification under Maryland law, that's fraud. It's well settled. Thank you. All right, thank you. Mr. Polman. So, J.G., what was the question you were going to ask me? Well, one question would be once the proof was produced, the double payment, what was your evidence at that point to show that you were owed more money than that? Two things. Exhibit 52, which they introduced. Where is that? That is at Appendix 232. Exhibit 52, which Judge Keogh relied on, by the way. So it's their exhibit, not mine. In fact, just about everything in this case is their exhibit, not ours. I mean Appendix 232, right. It's Exhibit 52, and on page 232, this is what they're relying on. So let's look at the bottom. And I pointed this out. We have received a total of $1,145,896.80 in payments from EYA, that's S.G. Holmes' parent company, including a check written directly to one of our vendors. We have billed a total of $1,407,445.64 plus $67,494.39. This does not include the pending change orders. They didn't dispute this letter. In fact, they put it in. This is their exhibit, not mine. So they put in an exhibit that they want Judge Keogh to rely on, and he relies on it. And it says, you still owe us $320,000. Okay. I thought there was an exhibit that you put in that showed there were still over half a million. No, if you keep going in Exhibit 52, this shows how much our vendors are unpaid. That does not say how much they paid them. They put in nothing that says how much they paid other people other than the stipulation. And we had this stipulation. Mr. Gould is trying to say, well, the stipulation was this was our... Tell me, where in the record do we find that you or whoever was doing the trial work argued to the bankruptcy court or the district court, we don't, there are no damages here because they owe us more money than they double-paid. Did anybody ever stand up and say that? This is our defense, Your Honor. I did. That's in the legal argument, in closing arguments to the judge. I point out this. I pointed out that SG said, we're going to use your money to pay these guys. And Judge here on page 37 of my opening brief says, because Mr. Gould made that same argument saying, well, he stipulated to these damages. No, I didn't. And he says, Mr. Foreman argues this was not stipulation of damages from the fraud, and I totally agree with him because that was not the stipulation. The stipulation was they paid $208,000 to our subs. That's the stipulation. I didn't want to make him put in invoice after invoice. We agree. They paid $208,000 of our subs. But they said, and I told this to Judge Geer, they said they were going to do it with our money. Okay. You did it with our money. Fine. And that was in their case in chief. That was absolutely in their case in chief. Now, this over $500,000 in unpaid, so I ask you a question, Your Honor, if I could. So where does he say... You're not likely to get an answer. I understand that. They're rhetorical. They're totally rhetorical. But, Your Honor, the problem is that what Judge Geer based his decision on, he says, look, yeah, I see that, you know, I see what's in 52 here, but he says, but that ignores one other fact, and that is without double paying because they never paid Chesapeake. Did they have to pay material men and subs for work done on those invoices in September and October? That's his rhetorical question. And he says, well, yeah, I think they did. There's no evidence of that. Judge Geer can't speculate on what else they did. And that's where Judge Geer said, I mean, after all, when they say we're going to use your money to pay these subs, and by the way, the stipulation of the $200,000... There was testimony in a deposition, or maybe it was live testimony from one of the finance people that said, at the time I made that statement, I only knew the debts at that time, but we had far more later on. There was no testimony of what they claimed they paid, and I will tell you this, that when Mr. Randall walked through how he got the $208,000, it's the 197 of the 208 are these very contractors where he says, Ferguson, Horizon, Contact, they haven't been paid. Those subs are 197 of the 208. He says, you haven't paid Ferguson, Horizon, and Contact, and we're going to use your money to pay them. Now, there's no testimony from them disputing that that's what they did. There's no explanation of, well, you said we did the math. We've already done it based on our preliminary calculations. Once these subs and suppliers are paid, no money will be due to you. Okay, so wouldn't it then be incumbent on them to say to the court, okay, and here's the money that we owed them. Here's what we did with it. Here's why we're saying the full 208 that we paid is our damages. You just can't get there from here. Now, I will say, Your Honor, I think, Judge Gregory, you hit it right on the head. We're already under contract. We're months into the contract, and Judge Quarles, actually, in his affirmance, set out a timeline. And the fact of the matter is that the timeline says it was in late March that Mr. Maranucci finally decided, I'm not getting a bond. And, Your Honor, I would like to say what you said. I'd like to read what you said in Roundtree on page 219. It is clear from the structure of the phrase that, quote, to the extent obtained modifies the money, property, services, or credit that constitute the debt. A plain reading of this subsection demonstrates that Congress accepted from discharge not simply any debt incurred as a result of fraud, but only debts in which the debtor used fraudulent means to obtain money, property, services, or credit. Structurally, the subsection can have no other meaning. So if they are already under contract and then they say, hey, Maranucci, where's the bond? He says, I'm going to get it for you. And he's lying. They're already under contract. They didn't rely on that to give him a contract. And that, I submit, Your Honor, is what is required of fraud. Finally, I would just, if I could take two seconds here, the issue with the certifications, there is a huge difference, Your Honors, I see, may I finish a sentence? Thank you. There is a huge difference between what the law says you've got to do in the construction trust statute and the language that they asked this man to sign. This court has said in Catalina, it's in my brief, you can't change the language. And you can't add words to say, well, this is what I think they meant. If the words are clear, if they're unambiguous, they mean what they say, they say what they mean. No further questions. Thank you so much, Your Honors. Thank you, Counsel. We're going to ask the clerk to adjourn the court for the day, and then we're going to come down and read counsel.
judges: Roger L. Gregory, G. Steven Agee, David A. Faber